**U.S. DEMOLITION & CONTRACTING, INC., Appellee and Cross–Appellant,**

**v.**

**O'ROURKE CONSTRUCTION COMPANY et al., Appellants and Cross–Appellees.**

[Cite as *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr. Co.* (1994), 94 Ohio App.3d 75.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64372.

Decided March 28, 1994.

*Darryl E. Pittman & Assoc.* and *Darryl E. Pittman,* for appellee and cross-appellant.

*Hermann, Cahn & Schneider, Anthony J. Hartman* and *Thomas P. Marotta,* for appellants and cross-appellees.

SPELLACY, Presiding Judge.

O'Rourke Construction Company ("O'Rourke") and Reliance Insurance Company ("Reliance") appeal an $84,416 judgment for U.S. Demolition and Contracting, Inc. ("USD"). USD appeals the dismissal of its claims of pattern of corrupt activity ("PCA") made under R.C. 2923.31 *et seq.* O'Rourke and Reliance raise four assignments of error:

"I. The trial court erred in granting summary judgment for the plaintiff as there were numerous disputed issues of material fact.

"II. The trial court erred in refusing to submit any of defendant's [*sic*] proposed interrogatories to the jury.

"III. The trial court erred in failing to define 'preponderance of the evidence' in its charge to the jury.

"IV. The trial court erroneously instructed the jury as to the measure of damages."

USD raises one assignment of error:

"The trial [court] erred when it granted defendant's [*sic*] motion for judgment on the pleadings because the complaint alleged a set of facts upon which plaintiff could recover."

O'Rourke and Reliance's first assignment of error has merit. As a result, their second, third, and fourth assignments of error are moot. USD's assignment of error lacks merit. Consequently, we affirm the judgment in part, reverse the judgment in part, and remand the cause for further proceedings.

I

USD brought this action alleging a breach of contract claim against O'Rourke and Reliance and PCA claims against O'Rourke, Reliance, Patrick O'Rourke, individually and as president of O'Rourke, and Jacquelyn Schurger, individually

and as vice-president of O'Rourke. O'Rourke counterclaimed, alleging breach of contract.

O'Rourke, Reliance, Patrick O'Rourke, and Jacquelyn Schurger then moved for a dismissal, under Civ.R. 12(C), of USD's PCA claims and USD moved for summary judgment, under Civ.R. 56, on the issue of liability for its breach of contract claim. The trial court granted both motions, dismissing USD's PCA claims and finding for USD on "all contract claims."

After a trial, the jury found USD sustained $215,564 in damages. It then set off these damages against damages sustained by O'Rourke, awarding USD $84,416.

## II

In its complaint, USD made the following allegations concerning its PCA claims:

"25. This count arises under Ohio Revised Code Section[s] 2923.32(A)(2) and (3), (the 'Ohio Rico Statute') that makes it unlawful to conduct the affairs of an enterprise through a pattern of corrupt activity.

"26. Defendants Patrick O'Rourke, Jacqueline Schurger, and O'Rourke Construction at all times relevant hereto were associated for the common purpose of utilizing predatory contracting practices against minority contractors.

"27. Defendant O'Rourke Construction and defendants Patrick O'Rourke and Jacquelne [sic] Schurger engaged in a pattern [of] corrupt activity. This activity among other things violated Ohio Rev.Code Sections 2905.11 (extortion); 2905.12 (coercion); 2921.11 (perjury); and 2913.02 (theft). In addition, defendants violated 18 U.S.C. 1341 (mail fraud) and 18 U.S.C. 134 (wire fraud) by using the mails and the telephone to further their scheme to obtain money by false representations or promises.

"28. Schemes similar to that pursued by defendants in the present case have become known in the minority contracting community as 'Majority Predatory Business Practices.' Typically, the scheme is employed in situations where a majority contract is required to use a minority contractor (MBE) to satisfy minority participation requirements to qualify for contracts. Most often this litigation occurs in connection with public contracts but it can also occur in private contracts where a bid which includes some minority participation is favored.

"29. The predatory contractor usually seeks an MBE with the ability to complete a substantial portion of the job but not enough working capital to finance the work without prompt progress payments. The predatory contractor

attempts to precipitate a cash flow crisis for the MBE and/or creates a pretext to disqualify it. The MBE is thrown off the job with little or no money for the work it has performed. The predatory contractor, on the other hand, completes the work and is paid for or receives the benefit of work actually performed by the MBE.

"30. Defendants in the present case engaged in an enterprise which utilized predatory business practices to exploit MBE's. Among the MBE's in addition to plaintiff, exploited by defendants were NCMD, owned by Willie Jackson in connection with the Tower City Project; Craig & Sons of Columbus, Ohio, in connection with a project performed for the City of Cincinnati; Thorton Demolition, in connection with the Union Station project in Washington, D.C.; and ACA Excavation & Demolition, in connection with the Maryland Street Garage project in Indianapolis, Indiana.

"31. The conduct of defendants in the cases mentioned in paragraph 22 [1] and in the present case, violates Section 2932.32(A) of the Revised Code, which makes it unlawful to participate in the affairs of an enterprise through a pattern of corrupt activity, and Section 2932.32(A)(3), which makes it unlawful to use or invest any of the proceeds of that corrupt activity. [Footnote added.]

"32. Plaintiff was damaged by defendants' corrupt activities in the amount of $428,000 and is entitled to three fold damages in the amount of $1,284,000 with interest at the rate of 12% per annum and reasonable attorneys' fees.

"WHEREFORE, plaintiff prays that it be awarded damages jointly and severally from defendants in the amount of $1,284,000 or in such other amount which may be proved at trial together with interest at the rate of 12% per annum from June 28, 1990 and reasonable attorneys fees."

### III

Evidentiary material reveals the following:

In February 1990, USD learned that the city of Shaker Heights was soliciting bids for a demolition contract. Aware that it would be unable to satisfy the bond requirement for the bid, USD approached O'Rourke and suggested that it enter a bid for the demolition contract and then subcontract the work to USD. O'Rourke accepted USD's proposal, entered a bid, and, on March 9, 1990, was awarded the demolition contract, under which it was to receive $523,700.

---

1. Paragraph twenty-two of the complaint provides:
   "Plaintiff states that O'Rourke Construction was paid by the [*sic*] Shaker Heights for work performed by plaintiff."

On April 6, 1990, USD and O'Rourke executed a subcontract agreement (the "subcontract"), which provided for USD to receive $423,700. Under the subcontract, USD agreed to perform "the entire contract as if it [were] the prime contractor to the Owner." The subcontract went on to provide:

"1.2   Contract Documents.   * * * With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to O'Rourke by each and all of the terms and provisions of the General Contract and the other Contract documents, and to assume toward O'Rourke all of the duties, obligations and responsibilities that O'Rourke by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that O'Rourke shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against O'Rourke with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

"1.3   Time of Completion.   * * * Should the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor * * * so as to cause any additional cost, expense, liability or damage to O'Rourke or to the Owner or any damages or additional costs or expenses for which O'Rourke or the Owner may or shall become liable, the Subcontractor shall and does hereby agree to compensate O'Rourke and the Owner for any and indemnify them against all such costs, expenses, damages, including any liquidated damages provided in the General Contract, and liability.
"* * *

"2.1   Monthly Estimate.   Before the first and Third Friday of each month the Subcontractor shall submit to O'Rourke, in the form required by O'Rourke, a written requisition for payment showing the proportionate value of the Work installed to that date; all previous payments; and all charges for services, materials, equipment and other items furnished by O'Rourke to or chargeable to the Subcontractor; and the balance of the amount of such requisition, as approved by O'Rourke and the Architect and for which payment has been received by O'Rourke from the Owner, shall be due and paid to the Subcontractor within three (3) days after receipt of payment from Owner. * * *

"2.3   Payment Withheld.   * * * [I]f the Subcontractor fails to perform, or is otherwise in default under any of the terms or provisions of this Agreement, O'Rourke shall have the right to retain from any payment then due or thereafter to become due an amount which it deems sufficient to (1) satisfy, discharge and/or

defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure or default, and (3) compensate O'Rourke and the Owner for and indemnify them against any and all losses, liability, damages, costs and expenses, including legal fees and disbursements, which may be sustained by either or both of them in connection therewith. O'Rourke shall have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes."

USD began work on April 19, 1990. On that date, two buildings had been released for demolition. Apparently, Shaker Heights had difficulty obtaining release of the remaining buildings. Several more buildings were released on April 25, 1990, and one building was moved from stage one, which needed to be completed by May 25, 1990, to stage two.

On May 7, 1990, O'Rourke advanced $10,000 to USD. On May 10, 1990, USD billed O'Rourke $68,639.40 for the first payment period, listing the proportionate value of the work completed as eighteen percent. On May 11, 1990, Shaker Heights paid O'Rourke $86,103 for the first payment period. On May 14, 1990, O'Rourke paid USD $58,639 for the first payment period.

In mid-May 1990, Jon Thomas, Shaker Heights' project manager, informed O'Rourke that USD was incapable of completing the work on time. As a result, on May 22, 1990, O'Rourke began providing equipment to USD.

On May 31, 1990, Shaker Heights paid O'Rourke $76,248 for the second payment period. On June 8, 1990, O'Rourke billed USD $22,826.32 for the equipment it had provided. On June 5, 1990, O'Rourke paid USD $40,000 for the second payment period.

On June 13, 1990, and June 14, 1990, O'Rourke billed USD $40,926 and $32,539 for additional equipment.

On June 18, 1990, Shaker Heights informed O'Rourke that it would not make any more progress payments because O'Rourke had failed to meet one of the demolition contract's deadlines.

On June 28, 1990, USD notified O'Rourke that it had defaulted. On June 29, 1990, O'Rourke notified USD that it had defaulted.

On July 10, 1990, O'Rourke billed USD $30,380 for additional equipment. On August 1, 1990, Shaker Heights paid O'Rourke $175,352 for the third and fourth payment periods.

## IV

In their first assignment of error, O'Rourke and Reliance contend that the trial court erred when it entered summary judgment for USD.

■ Civ.R. 56 governs our review. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 78, 506 N.E.2d 212, 215. In *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274, the court stated:

"Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."

The moving party bears the burden of showing that no genuine issue exists as to any material fact. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. After the moving party produces evidence in support of its motion, the nonmoving party must produce evidence upon any issue for which it bears the burden of production. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus.

■ In its motion for summary judgment, USD argued that O'Rourke breached the subcontract by failing to make proper payments, failing to provide an on-site supervisor, and failing to obtain the timely release of buildings for demolition. Reviewing the evidence most strongly for O'Rourke, we find that USD has failed to meet its burden of showing that no genuine issues exist as to any material fact. Summary judgment, therefore, was inappropriate.

First, USD argues that O'Rourke underpaid the first payment because it used eighteen percent instead of 18.2 percent as the proportionate value of the work USD had performed. In its $68,639 bill on May 10, 1990, for the first payment period, however, USD itself listed eighteen percent as the proportionate value of the work performed. O'Rourke, with its $10,000 advance on May 7, 1990, and $58,639 payment on May 14, 1990, paid this bill in full.

USD also argues that O'Rourke underpaid the second payment and failed to make the third and fourth payments. Sections 1.3 and 2.3 of the subcontract, however, allow O'Rourke to withhold payments if it has had to advance equipment to USD.

USD goes on to argue that the second payment was late. The subcontract required O'Rourke to pay USD within three days of receiving payment from Shaker Heights. Although the record reveals that Shaker Heights paid the second payment on May 31, 1991, it is unclear when O'Rourke received the payment.

Second, USD, citing section 1.2 of the subcontract, argues that the demolition contract's requirement that O'Rourke provide an on-site manager was incorporated by reference into the demolition contract. Under section 1.2 of the subcontract, however, USD, not O'Rourke, agreed to be bound by the demolition contract.

Finally, USD argues that O'Rourke failed to obtain the timely release of buildings for demolition. The evidentiary material is unclear about the cause of this delay or the effect of the delay.

Accordingly, O'Rourke and Reliance's first assignment of error is well taken.

V

O'Rourke and Reliance's second, third, and fourth assignments of error are moot.

VI

█ In its assignment of error, USD contends the trial court erred when it dismissed its PCA claims.

Our review is governed by Civ.R. 12(C). Under Civ.R. 12(C), the material allegations in the complaint and reasonable inferences arising from them must be accepted as true. *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 165–166, 63 O.O.2d 262, 264–265, 297 N.E.2d 113, 116–117.

PCA is patterned after the Racketeering Influenced and Corrupt Organizations Act ("RICO"), Section 1961 *et seq.*, Title 18, U.S.Code. *State v. Thrower* (1989), 62 Ohio App.3d 359, 369, 575 N.E.2d 863, 870; *Universal Coach, Inc. v. New York City Transit Auth.* (1993), 90 Ohio App.3d 284, 290, 629 N.E.2d 28, 32; Note, Ohio's Pattern of Corrupt Activities Law: Ohio Revised Code Sections 2923.31–.36 (1991), 17 U. Dayton L.Rev. 279, 280. In applying PCA, Ohio courts look to federal case law applying RICO. *Thrower*, 62 Ohio App.3d at 369–370, 575 N.E.2d at 870–871; *Universal Coach, supra,* 90 Ohio App.3d at 291–292, 629 N.E.2d at 32–33.

A civil PCA claim may be brought by "[a]ny person who is injured or threatened with injury by a violation of R.C. 2923.32 * * *." R.C. 2923.34(B). R.C. 2923.32(A) provides:

"(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

"(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

"(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property in the establishment or operation of any enterprise."

"[P]erson" includes corporations. See R.C. 2923.31(G) and R.C. 1.59. "Enterprise" includes any "group of persons associated in fact although not a legal entity." R.C. 2923.31(C).

Similarly, a civil RICO claim may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 * * *." Section 1964. Section 1962 provides:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt * * * to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

" * * *

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

A.   USD's R.C. 2923.32(A)(1) Claim

"Persons," not the "enterprise," are liable. R.C. 2923.32(A)(1) and 2923.34(B). The person and the enterprise, therefore, must be separate entities. *Universal*

*Coach, supra,* 90 Ohio App.3d at 291, 629 N.E.2d at 32, citing *Fleischhauer v. Feltner* (C.A.6, 1989), 879 F.2d 1290. As *B.F. Hirsch v. Enright Refining Co., Inc.* (C.A.3, 1984), 751 F.2d 628, 633, noted:

"Under [RICO] the 'person' must be employed or associated with an 'enterprise.' The Enright Refining Company, Inc. is clearly not employed by The Enright Refining Company, Inc.; nor is it logical to say that The Enright Refining Company, Inc. is associated with The Enright Refining Company, Inc. Thus, the language contemplates that the 'person' must be associated with a separate 'enterprise' before there can be RICO liability on the part of the person."

Further, an enterprise "is not a 'pattern of racketeering activity,' but must be 'an entity separate and apart from the pattern of activity in which it engages." *Old Time Enterprises, Inc. v. Internatl. Coffee Corp.* (C.A.5, 1989), 862 F.2d 1213, 1217, citing *Montesano v. Seafirst Commercial Corp.* (C.A.5, 1987), 818 F.2d 423, 424.

█  Finally, although a corporation may be a member of an enterprise, the enterprise may not simply be composed of a corporation and its officers or employees. *Parker & Parsley Petroleum v. Dresser Industries* (C.A.5, 1992), 972 F.2d 580, 583; *Bd. of Cty. Commrs. v. Liberty Group* (C.A.10, 1992), 965 F.2d 879, 885; *Old Time Enterprises v. Internatl. Coffee Corp., supra,* 862 F.2d at 1217; *Yellow Bus Lines, Inc. v. Local Union 639* (C.A.D.C.1988), 839 F.2d 782, 791; *Atkinson v. Anadarko Bank & Trust Co.* (C.A.5, 1987), 808 F.2d 438, 441. As *Yellow Bus,* 839 F.2d at 791, found:

"In short, an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself."

USD's complaint fails to allege an enterprise. The alleged association in fact either had no existence as an entity separate from the predicate acts of corrupt activity or consisted solely of a corporation acting through its officers and employees. Thus, USD's R.C. 2923.32(A)(1) claim fails.

B.  USD's R.C. 2923.32(A)(2) and (A)(3) Claims

█  A party bringing a civil PCA claim under R.C. 2923.32(A)(2) must plead that the injury or threat of injury arises from the acquisition or maintenance of an interest in or control of an enterprise through a pattern of corrupt activity. See *Danielsen v. Burnside–Ott Aviation Training Ctr.* (C.A.D.C.1991), 941 F.2d 1220, 1231. The same analysis applies to R.C. 2923.32(A)(3), which requires injury or threat of injury arising from the use or investment of proceeds derived from a pattern of corrupt activity. *Id.* at 1230.

USD's complaint fails to allege an acquisition or maintenance injury. It also fails to allege a use or investment injury. Consequently, USD's R.C. 2923.-32(A)(2) and (3) claims fail.

Accordingly, USD's assignment of error is not well taken.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

JAMES D. SWEENEY and DYKE, JJ., concur.