OPINION
{¶ 1} Appellant, Charles W. Theisler ("Theisler"), appeals his convictions for engaging in a pattern of corrupt activity, drug trafficking, illegal processing of drug documents, and practicing medicine or surgery without a certificate, which were entered in the Trumbull County Common Pleas Court. On review, we affirm the judgment of the trial court.
 {¶ 2} Theisler was a licensed attorney as well as a licensed chiropractor. He had also received a medical degree, but was not licensed to practice medicine in Ohio, and did not possess a Drug Enforcement Administration certificate to dispense prescription drugs.
 {¶ 3} Theisler associated himself with two medical doctors, William Masters, M.D. and Christopher Sherman, M.D., under the name Pain Management Associates. Pain Management Associates opened at 5000 East Market Street, Howland Township, Trumbull County, Ohio, on July 2, 2001. It was in business between July 2, 2001 and January 26, 2004.
 {¶ 4} The first day the business opened, Dr. Masters suffered a heart attack. As a result of the heart attack, he was out of the office for four months. When Dr. Masters returned to the office he engaged in a part-time practice and saw only a few patients. He also signed numerous prescription pads in blank. The blank prescriptions were used by Theisler to give to patients to obtain their prescription medications as they returned to the office for follow-up treatment.
 {¶ 5} Pain Management Associates was investigated by the U.S. Drug Enforcement Administration ("DEA") and by the Ohio Board of Pharmacy. As a result of the investigation, a search warrant was executed for the business on January 26, 2004. Additional search warrants were executed on January 30, 2004 and February 17, 2004.
 {¶ 6} Theisler was indicted by the grand jury for 118 counts. All of the counts related to his activities at Pain Management Associates. The counts included engaging in a pattern of corrupt activity, drug trafficking, illegal processing of drug documents, and practicing medicine or surgery with a certificate. Theisler entered a not guilty plea to all counts.
 {¶ 7} Prior to trial, the state of Ohio moved for a nolle prosequi with respect to 12 of the counts. The motion for nolle prosequi was granted by the trial court.
 {¶ 8} The jury returned guilty verdicts to 86 of the 106 counts that were considered by it.
 {¶ 9} Theisler received sentences that, in the aggregate, totaled three years in prison. He has timely filed an appeal to this court, raising five assignments of error.
 {¶ 10} The first assignment of error is as follows:
 {¶ 11} "Appellant was denied due process and the liberties secured by Ohio Const. art I, §§ 1, 2, 10 and 16 when he was convicted of the offenses of engaging in a pattern of corrupt activity, trafficking in drugs, illegal processing of drug documents, and practicing medicine or surgery without a certificate upon insufficient evidence."
 {¶ 12} In this first assignment of error, we shall apply a sufficiency of the evidence analysis to the convictions for engaging in a pattern of corrupt activity, drug trafficking, illegal processing of drug documents, and practicing medicine or surgery without a certificate.
 {¶ 13} "`"The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inferences drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about dueprocess. It raises a question of law, the resolution of which does notallow the court to weigh the evidence. * * *" * * *' * * *
 {¶ 14} "In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence `in a light most favorable to the prosecution,' * * * `(a) reviewing court (should) not reverse a jury verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an 1offense have been proven beyond a reasonable doubt.'"[1]
 {¶ 15} Thus, "[a]n appellate court must look to the evidence presented to determine if the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable doubt."[2]
 {¶ 16} Moreover, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the [jury]."[3]
 {¶ 17} Count One of the indictment charged Theisler with engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1) and (B)(1).
 {¶ 18} R.C. 2923.32(A)(1) and (B)(1) read as follows:
 {¶ 19} "(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity[.] * * *
 {¶ 20} "(B)(1) Whoever violates this section is guilty of engaging in a pattern of corrupt activity. * * *"
 {¶ 21} As charged, the offense constituted a felony of the first degree.
 {¶ 22} "Enterprise" is defined in R.C. 2923.31(C) as follows:
 {¶ 23} "(C) `Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, or group of persons associated in fact although not a legal entity. `Enterprise' includes illicit as well as licit enterprises."
 {¶ 24} A conviction for engaging in a pattern of corrupt activity must be supported by evidence "(1) that conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and (3) that the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise."[4]
 {¶ 25} Theisler argues that there was insufficient evidence to establish that he participated in the affairs of a separate entity constituting a criminal enterprise: "there was absolutely no evidence of a separate criminal enterprise distinct from [Pain Management Associates]." In this connection, he refers to the trial court's instruction, which stated, in part, as follows: "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself." Thus, he argues that the criminal "enterprise" must be an entity separate and distinct from Pain Management Associates.
 {¶ 26} Theisler also denies that he had acquired and maintained an interest in or control of a criminal enterprise. Further, he argues, he did not work for Pain Management Associates as an employee or independent contractor.
 {¶ 27} Contrary to Theisler's argument, the state of Ohio argues that Pain Management Associates was the criminal enterprise, that it was composed of Dr. Masters and Dr. Sherman, and that Dr. Masters and Dr. Sherman held themselves out as Pain Management Associates, but, in fact, they were two separate business entities. The state of Ohio compares this arrangement to a space-sharing arrangement of a law office, where several attorneys may share space, expenses, and staff, but, in fact, conduct separate law practices.
 {¶ 28} The case of U.S. Demolition Contracting, Inc. v. O'RourkeConstr. Co. discusses the relationship of "persons" and "enterprise" for purposes of the pattern of corrupt activity statutes (R.C. 2923.31 et seq.).[5]
 {¶ 29} The court in the O'Rourke Constr. Co. case points out, first of all, that:
 {¶ 30} "[The Ohio pattern of corrupt activity statutes are] patterned after the Racketeering Influenced and Corrupt Organizations Act (`RICO'), Section 1961 et seq., Title 18, U.S. Code. * * * In applying [the Ohio pattern of corrupt activity statutes], Ohio courts look to federal case law applying RICO."[6]
 {¶ 31} That court goes on to explain that:
 {¶ 32} "`Persons,' not the `enterprise,'are liable. * * * The person and the enterprise, therefore, must be separate entities. * * * `[T]he language contemplates that the "person" must be associated with a separate "enterprise" before there can be RICO liability on the part of the person.'[7]
 {¶ 33} "Further, an enterprise `is not a "pattern of racketeering activity," but must be "an entity separate and apart from the pattern of activity in which it engages."'[8]
 {¶ 34} "Finally, although a corporation may be a member of an enterprise, the enterprise may not simply be composed of a corporation and its officers or employees."[9]
 {¶ 35} The case of Cedric Kushner Promotions, Ltd. v. King, decided by the United States Supreme Court, is particularly instructive on the issue of whether Theisler, as a "person," is sufficiently distinct from the "enterprise" of Pain Management Associates; and whether there must be an "enterprise" separate and distinct from Pain Management Associates, as argued by Theisler.[10]
 {¶ 36} In the King case, petitioner alleged that the respondent violated the RICO statutes by engaging in a pattern of corrupt activity in the conduct of his business. Respondent maintained that he could not be a "person" operating a separate "enterprise" because he was the president and sole shareholder of his closely held corporation. The United States Supreme Court held that, while an "enterprise" must be more than the individual operating under another name, the requisite distinctness between the respondent and his corporation was sufficient to establish that they were legally distinct entities. In other words, respondent as the sole shareholder/officer/employee was the "person," and his corporation was the "enterprise."[11] In this regard, that court stated:
 {¶ 37} "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more `separateness' than that."[12]
 {¶ 38} Here, there are at least four separate entities: Theisler, Dr. Masters, Dr. Sherman, and Pain Management Associates. Each of them was separate from the others. The record does not tell us what kind of entity Pain Management Associates was, but it does not matter, because the definition of "enterprise" would include within its reach an association, whether or not a legal entity; and certainly the other three individuals were entities separate and distinct from Pain Management Associates. Theisler's argument, therefore, fails to account for the fact that there were three entities separate and distinct from Pain Management Associates.
 {¶ 39} Therefore, we are not persuaded that there was insufficient evidence to establish the offense of engaging in a pattern of corrupt activity. The elements of the offense were established insofar as Theisler was convicted of multiple offenses of drug trafficking (which is one of the offenses enumerated as an offense constituting "corrupt activity"[13]), his conduct constituted a "pattern of corrupt activity" as that term is defined in R.C. 2923.31(E) ("two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event"), and he has participated in the affairs of an enterprise, to wit, Pain Management Associates.
 {¶ 40} We do not analyze whether Theisler acquired and maintained an interest or control of the "enterprise." The evidence demonstrates that, at a minimum, he was an employee of Pain Management Associates and was, therefore, participating in the affairs of an "enterprise," which is sufficient to satisfy that element of the offense.
 {¶ 41} Theisler was also charged with numerous counts of drug trafficking and aggravated drug trafficking.
 {¶ 42} With respect to drug trafficking and aggravated drug trafficking, R.C. 2925.03 provides, in pertinent part, as follows:
 {¶ 43} "(A) No person shall knowingly do any of the following:
 {¶ 44} "(1) Sell or offer to sell a controlled substance;
 {¶ 45} "* * *
 {¶ 46} "(B) This section does not apply to any of the following:
 {¶ 47} "(1) Manufacturers, licensed health professionals authorized to prescribe drugs, pharmacists, owners of pharmacies, and other persons whose conduct is in accordance with Chapters 3719; 4715; 4723; 4729; 4731; and 4741. of the Revised Code;
 {¶ 48} "* * *
 {¶ 49} "(C) Whoever violates division (A) of this section is guilty of one of the following:
 {¶ 50} "(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II * * *, whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:
 {¶ 51} "* * *
 {¶ 52} "(d) * * * [I]f the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated trafficking in drugs is a felony of the second degree[.]
 {¶ 53} "* * *
 {¶ 54} "(2) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule III, IV, or V, whoever violates division (A) of this section is guilty of trafficking in drugs. The penalty for the offense shall be determined as follows:
 {¶ 55} "* * *
 {¶ 56} "(c) * * * [I]f the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, trafficking in drugs is a felony of the fourth degree[.]"
 {¶ 57} Thus, the difference between drug trafficking and aggravated drug trafficking relates to the type of drug involved in the offense. If the drug is a schedule III, IV, or V drug, then the offense constitutes drug trafficking. If the drug is a schedule I or schedule II drug, then the offense constitutes aggravated drug trafficking. The penalty for each type of offense is determined by the quantity of the drug involved in the offense, in this case, less than five times the bulk amount (drug trafficking) or less than fifty times the bulk amount (aggravated drug trafficking).
 {¶ 58} "Sale" of drugs is defined to include "delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee."[14]
 {¶ 59} "`Schedule I,' `schedule II,' `schedule III,' `schedule IV,' and `schedule V' mean controlled substance schedules I, II, III, IV, and V, respectively, established pursuant to section 3719.41 of the Revised Code, as amended pursuant to section 3719.43 or 3719.44 of the Revised Code."[15]
 {¶ 60} In Theisler's case, the drugs involved in the drug trafficking counts were Lortab, a schedule III drug; and the drugs involved in the aggravated drug trafficking counts were Percocet, Methadone, morphine sulphate, and Oxycontin, all of which are schedule II drugs.
 {¶ 61} "`A person can "offer to sell a controlled substance" in violation of R.C. 2925.03(A)(1) without transferring a controlled substance to the buyer.'"[16] Moreover, "the failure to physically deliver a controlled substance is not an absolute defense to an indictment alleging a violation of R.C. 2925.03(A)."[17] As stated by the Supreme Court of Ohio, "it is clear that an individual does not have to actually deliver the physical substance to violate the statute. * * * [T]he sale of a completed prescription form is sufficiently analogous to the sale of an illicit drug as to warrant the same conclusion."[18]
 {¶ 62} At trial, nine patients who were patients of Dr. Masters testified. Their testimony was to the effect that, upon their initial visit to Dr. Masters, they were examined by him, he made a diagnosis, and, then, he prescribed controlled substances for them. However, at their follow-up visits, more likely than not Dr. Masters was not in the office, so they did not see Dr. Masters. Instead, they saw Theisler, they were examined by him, and, in the absence of Dr. Masters, they were given prescriptions for their controlled substances on prescription forms that had been signed in blank by Dr. Masters. Controlled substances may not be refilled, so these patients had to get new prescriptions each time they filled their prescriptions for controlled substances. Theisler ordered the new prescriptions for them at their follow-up visits. Theisler was not supervised by Dr. Masters or Dr. Sherman on any of those occasions for which he was convicted. Theisler was acting of his own accord in ordering the prescriptions for the patients. From the standpoint of a sufficiency of the evidence analysis, Theisler was involved in the sale of controlled substances for purposes of R.C. 2925.03(A)(1).
 {¶ 63} Theisler was also charged with numerous counts of illegal processing of drug documents, in violation of R.C. 2925.23(B)(1).
 {¶ 64} R.C. 2925.23(B)(1) provides as follows:
 {¶ 65} "(B) No person shall intentionally make, utter, or sell, or knowingly possess any of the following that is a false or forged:
 {¶ 66} "(1) Prescription[.]"
 {¶ 67} To "utter" means to "issue, publish, transfer, use, put or send into circulation, deliver, or display."[19]
 {¶ 68} Under OhioAdmin. Code 4729-5-01(H), an "original prescription" is defined as a "prescription issued by the prescriber in writing, an oral or electronically transmitted prescription recorded in writing by the pharmacist, a prescription transmitted by use of a facsimile machine, or a prescription transmitted by a board approved electronic prescription transmission system, each of which is pursuant to rule 4729-5-30 of the Administrative Code."
 {¶ 69} Rule 4729-5-30(B)(14)(a) of the Administrative Code requires prescriptions issued by a prescriber to a patient be "[m]anually signed on the day issued by the prescriber in the same manner as he/she would sign a check or legal document."
 {¶ 70} In order to present sufficient evidence that Theisler illegally processed drug documents, the state of Ohio needed to prove that Theisler uttered prescriptions that were false.
 {¶ 71} In denying Theisler's motion for acquittal filed after the jury returned guilty verdicts, the trial court explained the process by which Theisler uttered false prescriptions. The court's reference to "SOAP" notes is to notes made by a physician in a patient's chart. The term "SOAP" refers to subjective observations of the patient, objective observations of the patient, assessment of the patient, and the plan for the patient. The trial court stated in its entry denying Theisler's Crim.R. 29 motion:
 {¶ 72} "The testimony was overwhelming that [Theisler's] actions in creating the SOAP notes put into motion the necessary documentation for the staff of Pain Management Associates to fill in the body of the pre-signed prescriptions. Therefore, the element of `utter' was satisfied as [Theisler] did issue, put or send into circulation a prescription that by his own statements to law enforcement he knew were false. That is that the prescriptions were not manually signed on the day issued by a licensed health professional authorized to prescribe drugs."
 {¶ 73} The body of the prescription was not filled out by Theisler in all cases. It often happened that members of the Pain Management Associates staff would fill out the body of the prescription on prescription forms that had been pre-signed by Dr. Masters. However, as pointed out by the state of Ohio, "even though [Theisler] did not write all of the false prescriptions themselves, he `made' or `uttered' the documents by dictating the information or writing on a patient chart and putting those prescriptions in the flow of commerce."
 {¶ 74} Theisler argues that he could not have "uttered" any false prescriptions because, as a representative from the Ohio Board of Pharmacy testified, the SOAP notes are not themselves a prescription; and that he did not sign any of the prescription forms. However, his actions in dictating the SOAP notes, which were then given to an employee of Pain Management Associates, who in turn gave the patient a prescription pre-signed by Dr. Masters, were actions that constituted "uttering" a false prescription and, therefore, the illegal processing of drug documents. The patients left the office with false prescriptions as a result of what Theisler had done. The offense was complete at the time the patient was given the false prescription.
 {¶ 75} Theisler further argues that the case of State v. Williams
exonerates him.[20]Though the defendant-physician in theWilliams case was acquitted of illegal processing of drug documents even though he pre-signed prescriptions before he went on vacation, that case is distinguishable because, unlike Theisler, the defendant in that case was a physician. In the Williams case, the Fourth Appellate District held that "[t]here was nothing on the face of any of the prescriptions in evidence that was either false or forged."[21] The prescriptions ordered by Theisler were false, because they were not signed on the day the prescription was issued and the physician who signed them had not seen the patient on the day the prescription was ordered.
 {¶ 76} Thus, there was sufficient evidence to convict Theisler of illegal processing of drug documents.
 {¶ 77} Theisler was also charged with numerous counts of practice of medicine or surgery without a certificate, in violation of R.C. 4731.41.
 {¶ 78} R.C. 4731.41 provides, in pertinent part:
 {¶ 79} "No person shall practice medicine and surgery, or any of its branches, without the appropriate certificate from the state medical board to engage in the practice. No person shall advertise or claim to the public to be a practitioner of medicine and surgery, or any of its branches, without a certificate from the board. No person shall open or conduct an office or other place for such practice without a certificate from the board. No person shall conduct an office in the name of some person who has a certificate to practice medicine and surgery, or any of its branches."
 {¶ 80} The evidence in the instant case established that Theisler used the initials "M.D." on his business cards, on his SOAP notes, and in newspaper advertisements. Both employees and patients testified to the fact that they thought he was a medical doctor, and that he held himself out as such.
 {¶ 81} Moreover, Theisler was seeing patients and ordering prescriptions for them and, in some cases, changing the prescriptions for patients.
 {¶ 82} Finally, Theisler was being compensated for his treatment of the other doctors' patients.
 {¶ 83} Theisler concedes that he did not possess a certificate to practice medicine, but argues that he was not practicing medicine. According to Theisler, his use of "M.D." referred to his "medical degree," and did not refer to him as a medical doctor. In addition, he argues that he was merely carrying out the treatment plans and orders of Dr. Masters and Dr. Sherman, and that, as a licensed chiropractor, he was allowed to treat patients.
 {¶ 84} Apart from the fact that the jury did not accept Theisler's explanations for his actions, on a sufficiency of evidence analysis, the state of Ohio adduced sufficient evidence on all the elements of practicing medicine or surgery without a license.
 {¶ 85} Theisler's first assignment of error is without merit.
 {¶ 86} Theisler's second assignment of error is as follows:
 {¶ 87} "Convictions and a prison sentence violate U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9, and 16 when the convictions are against the manifest weight of the evidence."
 {¶ 88} In this assignment of error, Theisler is arguing that his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 89} "`The [appellate] court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[22]
 {¶ 90} Thus, the Supreme Court of Ohio has directed reviewing courts to reverse a conviction on the ground of manifest weight of the evidence only where there is a "manifest miscarriage of justice" and where the jury "clearly lost its way." Also, the weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide.[23]
 {¶ 91} Theisler argues that his convictions should be reversed in "the interest of justice" and the testimony of the witnesses "strained credulity." He asserts that the jury lost its way and violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because its verdicts were unreliable. We disagree.
 {¶ 92} The testimony of the witnesses was uncontroverted in almost every respect. Theisler did not dispute that he was a licensed chiropractor, and not a licensed medical doctor. He had only a medical degree. He did not dispute that he did not possess a DEA license to prescribe medications. He did not dispute that he treated Dr. Masters' patients when Dr. Masters was not physically present. He does not dispute that he dictated SOAP notes into the patients' charts, as a result of which the patients received prescriptions for controlled substances. He did not dispute that the initials "M.D." appeared after his name on the SOAP notes, his business cards, and in print advertising.
 {¶ 93} Nevertheless, Theisler asserts that he was performing as a medical assistant under Dr. Masters' supervision. However, this fact was disputed by three former staff employees of Pain Management Associates.
 {¶ 94} In addition, another office worker testified that Theisler and Dr. Masters did not confer very often about patients, because Dr. Masters was often not present in the office when the patients were being seen. This testimony was corroborated by Dr. Sherman, who testified that he became overwhelmed with his own patients and stopped
 {¶ 95} The testimony of the nine patients who testified for the state of Ohio was to the effect that, while they were first examined by Dr. Masters, their follow-up visits were with Theisler; they were treated by Theisler and prescribed medications; and they left the office with their prescriptions without ever having seen Dr. Masters.
 {¶ 96} After reviewing the record and the testimony of the witnesses, we conclude that the jury did not lose its way in convicting Theisler of engaging in a pattern of corrupt activity, drug trafficking, illegal processing of drug documents, and practicing medicine or surgery without a certificate.
 {¶ 97} The second assignment of error is without merit.
 {¶ 98} Theisler's third assignment of error is as follows:
 {¶ 99} "Appellant was denied due process and a fair trial by repeated state misconduct; U.S. Const., amend. XIV; Ohio Const., art. I, §§ 1, 2,10, and 16."
 {¶ 100} In this assignment of error, Theisler argues that certain actions of the prosecutor were misleading to the jury, thereby denying him due process of law. He cites State v. Iacona for the proposition that eliciting false testimony by the prosecutor constitutes a denial of due process if the false testimony could have affected the jury verdict, and is in the nature of prosecutor misconduct if the testimony was false, the statement was material, and the prosecutor knew it to be false.[24]
 {¶ 101} Theisler did not object to any of the alleged misconduct of the prosecutor at trial, so we are only able to review it from the standard of plain error.[25]
 {¶ 102} Crim.R. 52(B) states that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
 {¶ 103} "Error is not plain error unless the outcome of an accused's trial clearly would have been otherwise, but for the error. * * * The standard for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt-determining process. * * * Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice."[26]
 {¶ 104} The two areas of prosecutorial misconduct asserted by Theisler are (1) the prosecutor elicited testimony from a government witness that invaded the province of the jury when the witness testified that using pre-signed prescription forms was per se illegal, and (2) the prosecutor misled the jury in opening statement and closing argument by mischaracterizing the evidence regarding Theisler's medical qualifications.
 {¶ 105} We do not agree that there was any prosecutorial misconduct.
 {¶ 106} First of all, the testimony of William Schmidt, assistant director of the State Medical Board of Ohio, was offered by the state of Ohio as expert testimony to explain who can prescribe medication and who cannot. The trial court instructed the jury that, notwithstanding the expert character of the testimony, the jury was free to believe or disbelieve the testimony as with any other testimony. The fact that the expert witness stated his opinion on the per se illegality of using pre-signed prescription forms did not invade the province of the jury, because the jury was free to accept or reject his opinion.
 {¶ 107} As for the misstatements of the evidence that are asserted to have misled the jury, Theisler argues that the prosecutor's frequent references to him as a chiropractor, together with the prosecutor's failure to mention that Theisler was working for Dr. Masters and Dr. Sherman as a medical graduate in his capacity as a medical or physician assistant, constituted prosecutorial misconduct. Specifically, Theisler argues that the prosecutor misled the jury into thinking that Theisler was being prosecuted as a chiropractor who was practicing medicine illegally.
 {¶ 108} However, the statements by the prosecutor that Theisler was a chiropractor were true statements. His status as chiropractor was not challenged by the state of Ohio. A review of the record demonstrates that it was Theisler who was making misleading statements during his tenure at Pain Management Associates. The assistant to Dr. Sherman testified that she thought he was a medical doctor; the person in charge of processing workers' compensation forms was told numerous times by Theisler that he was a medical doctor. Some of the patients testified that they thought Theisler was a medical doctor. Theisler himself used the initials "M.D." on his SOAP notes, his business cards, and in print advertising.
 {¶ 109} Theisler added to the confusion by telling a state investigator that, while he was not a medical doctor, he was "functioning" as a physician's assistant. Theisler acknowledged in his testimony that he was not a licensed physician's assistant, and that he knew that physician assistants could not prescribe medication, but that he could "function" as a physician's assistant based upon his interpretation of R.C. 4730.03(C), which reads as follows:
 {¶ 110} "[Nothing in this chapter shall:]
 {¶ 111} "(C) Prohibit a physician from delegating responsibilities to any nurse or other qualified person who does not hold a certificate to practice as a physician assistant, provided that the individual does not hold the individual out to be a physician assistant[.]"
 {¶ 112} Thus, when the state and federal investigation started, Theisler denied to the investigating agents that he represented himself as a medical doctor. He insisted that he was a "qualified person," because he was a licensed chiropractor and that he was "functioning" as a physician's assistant, even though he was not licensed as such, based upon the loophole in R.C. 4730.03(C). As for the use of the initials "M.D.," he felt that this was proper, because he had a medical degree and that the use of the initials "M.D." should not have misled anyone into thinking he was passing himself off as a medical doctor.
 {¶ 113} The record is clear that Theisler was the person who was misleading people into thinking he was qualified to practice medicine. We do not agree that there was prosecutorial misconduct in the statements made by the prosecutor, nor do we find any plain error.
 {¶ 114} The third assignment of error is without merit.
 {¶ 115} Theisler's fourth assignment of error is as follows:
 {¶ 116} "The defendant was denied equal protection of the laws; U.S. Const., amend. XIV; Ohio Const., art I, § 2."
 {¶ 117} In this assignment of error, Theisler asserts that, by virtue of a due process violation argued in the third assignment of error, there was likewise an equal protection violation. His authority for this assertion is State v. Lane, where the Supreme Court of Ohio stated that "[b]y violating due process and the right to a fair and public trial, the legal conclusion is that there is a violation of the defendants' rights to equal protection."[27]
 {¶ 118} However, because we concluded in the third assignment of error that there was no due process violation in any actions of the prosecutor, the proposition that there was an equal protection violation is likewise for naught.
 {¶ 119} The fourth assignment of error is without merit.
 {¶ 120} Theisler's fifth assignment of error is as follows:
 {¶ 121} "The cumulative effect of errors denied appellant a fair trial and due process; accordingly, neither his convictions nor death sentence [sic] may stand under U.S. Const. amend. XIV and Ohio Const. art I, §§ 1, 2, 9, 10, and 16."
 {¶ 122} In this assignment of error, Theisler is relying uponState v. DeMarco[28] and Kyles v. Whitley[29] for the proposition that his trial was "fundamentally unfair" and that the cumulative effect of harmless errors committed by the trial court compels a reversal even if the individual errors, by themselves, would not.
 {¶ 123} The difficulty with Theisler's argument is that he has not demonstrated that the trial court committed errors, either harmless or prejudicial, so as to call for the doctrine of cumulative error.
 {¶ 124} "The doctrine [of cumulative error] is not applicable to the case at bar as we do not find multiple instances of harmless error."[30]
 {¶ 125} Where an appellant has not made a "persuasive showing of cumulative error,"[31] his argument is not meritorious.
 {¶ 126} The fifth assignment of error is without merit.
 {¶ 127} The judgment of the trial court is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs,
COLLEEN MARY O'TOOLE, J., concurs in judgment only.
[1] 1. (Citations omitted and emphasis in original.) State v.Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13-14.
[2] (Citations omitted.) State v. Clark, 11th Dist. No. 2002-A-0056,2003-Ohio-6689, at ¶ 16.
[3] State v. Dennis (1997), 79 Ohio St.3d 421, 430.
[4] Kondrat v. Morris (1997), 118 Ohio App.3d 198, 209, citingUniversal Coach v. New York City Transit Auth., Inc. (1993),90 Ohio App.3d 284, 291.
[5] U.S. Demolition Contracting, Inc. v. O'Rourke Constr. Co.
(1994), 94 Ohio App.3d 75.
[6] (Internal citations omitted.) Id. at 83.
[7] B.F. Hirsch v. Enright Refining Co., Inc. (C.A.3, 1984),751 F.2d 628, 633.
[8] Old Time Enterprises, Inc. v. Internatl. Coffee Corp. (C.A.5, 1989), 862 F.2d 1213, 1217, citing Montesano v. Seafirst CommercialCorp (C.A.5, 1987), 818 F.2d 423, 424.
[9] (Selected citations omitted.) U.S. Demolition Contracting, Inc.v. O'Rourke Constr. Co., supra, at 84-85.
[10] Cedric Kushner Promotions, Ltd. v. King (2001),533 U.S. 158.
[11] Id. at 163.
[12] Id.
[13] R.C. 2923.31(I)(2)(c).
[14] R.C. 3719.01(AA).
[15] R.C. 3719.01(BB).
[16] State v. Sway (1984), 15 Ohio St.3d 112, 115, quoting State v.Scott (1982), 69 Ohio St.2d 439, syllabus.
[17] Id.
[18] Id.
[19] R.C. 2913.01(H).
[20] State v. Williams (1992), 76 Ohio App.3d 806.
[21] Id. at 809.
[22] State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
[23] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. monitoring Theisler's interaction with Dr. Masters' patients.
[24] State v. Iacona (2001), 93 Ohio St.3d 83, 97.
[25] State v. Chinn (1999), 85 Ohio St.3d 548, 554.
[26] (Citations omitted.) State v. Hinson, 8th Dist. No. 87132,2006-Ohio-3831, at ¶ 12.
[27] State v. Lane (1979), 60 Ohio St.2d 112, 122.
[28] State v. DeMarco (1987), 31 Ohio St.3d 191, 196-197.
[29] Kyles v. Whitley (1995), 514 U.S. 419.
[30] State v. Garner (1995), 74 Ohio St.3d 49, 64.
[31] State v. Sanders (2001), 92 Ohio St.3d 245, 279.